Well, your argument first this morning in Case 10-553, Hosanna-Tabor Evangelical Lutheran Church and School v. the Equal Employment Opportunity Commission. Mr. Laycock. Mr. Chief Justice, and may it please the Court. The churches do not set the criteria for selecting or removing the officers of government, and government does not set the criteria for selecting or removing officers of the church. That's a bedrock principle, and these respondents would repudiate it. They no longer seriously argue that Cheryl Parrish was not a minister. Instead, they argue that even people who are indisputably ministers can sue their churches on claims that turn on their qualifications, their job performance, and the rules of ministry. Mr. Laycock, would you clarify one point? You say the church decides who's qualified to be a minister, but as I understand the facts here, she was never decommissioned as a minister. And beyond that, she was even recommended by the officials to other parishes to be a commissioned minister. So it's odd to say there's any interferences with who is qualified to be a minister, because the church was holding her out as being qualified. Well, she was removed from her ministry at Hosanna Tabor. They do not have to indulge in a vendetta against her and file charges with the Senate. And if you look at that recommendation, it's in the joint appendix. It is not much of a recommendation. There is excellent, commendable, proficient, and in ministry qualities, she gets proficient. We all know if there's a five, a four, and a three, a three isn't very good. So they were not recommending her. They simply weren't pursuing formal charges against her before the Missouri Senate. And the problems they had were most severe at Hosanna Tabor. In another congregation that didn't know this history, she might have been able to be effective again. That was for them to decide. They make their own calls. But she was removed at Hosanna Tabor, which is where the problem was. Sotomayor, most of the circuits have recognized a ministerial exception. But they've, in one form or another, created a pretext exception. The reason for that is the situation that troubles me. How about a teacher who reports sexual abuse to the government and is fired because of that reporting? Now, we know from the news recently that there was a church whose religious beliefs centered around sexually exploiting women and, I believe, children. Regardless of whether it's a religious belief or not, doesn't society have a right at some point to say certain conduct is unacceptable, even if religious? Smoking peyote. And once we say that's unacceptable, can and why shouldn't we protect the people who are doing what the law requires, i.e., reporting it? So how do we deal with that situation under your theory? Under your theory, nothing survives if the individual is a minister. No claim, private claim. I think if you look at the court of appeals cases, they have not indulged in pretext inquiries from ministers. The case you present is obviously a difficult case. And I would say two things. We think the appropriate rule should be the government can do many things to force reporting, to penalize people who don't report. But a discharge claim by a minister presents the question of why she was discharged and the court should stay out of that. The problem with that is that it doesn't take account of the societal interest in encouraging the reporting. And, in fact, if we define the ministerial exception in the way you want, we take away the incentive for reporting. We actually do the opposite of what society needs. I understand that concern, and that was my second point, that if you want to carve out an exception for cases like child abuse where the government's interest is in protecting the child, not an interest in protecting the minister, when you get such a case, we think you could carve out that exception. How? Give me a theoretical framework for this. Okay. First, you have to identify the government's interest in regulation. If the government's interest is in protecting ministers from discrimination, we are squarely within the heart of the ministerial exception. If the government's interest is something quite different from that, like protecting the children, then you can assess whether that government interest is sufficiently compelling to justify interfering with the relationship between the church and its ministers. But the government's interest is at its nadir when the claim is we want to protect these ministers as such. We want to tell the churches what criteria they should apply for selecting or removing ministers. And, Mr. Laycock, the ministerial exception is not something new. It has been widely recognized, as Justice Sotomayor mentioned, by the courts of appeals going back 40 years. So we can see how the recognition of this exception within — with certain contours has worked out. And how has it worked out over those past 40 years? Have there been a great many cases, a significant number of cases involving the kinds of things that Justice Sotomayor is certainly rightly concerned about, instances in which ministers have been fired for reporting criminal violations and that sort of thing? The only — I'm not aware of any such case. The one case I am aware of cuts the other way. A minister, a priest accused of sexually abusing children who was fired sued to get his job back. And the church invoked the ministerial exception, and that case ended. They were able to get rid of him. There is a cert petition pending in which a teacher with a long series of problems in her school called the police about an allegation of sexual abuse that did not happen at the school, did not involve a student at the school, did not involve a and had them come interview a student without any communication with her principal. And the Respondents tried to spin that as a case of discharge reporting sexual abuse. But if you look at the facts, it's really quite different. And those are the only two cases I'm aware of that even approach touching on this problem. Kennedy But here what we have is a claim of retaliation so that you can't even get a hearing. So we can look at the various tests that are proposed here. And I think it's difficult to formulate the test. But this can't even be litigated because she is discharged, the allegation is, that there is a retaliation for even asking for a hearing where these tests could be applied. Scalia Well, she can't get a hearing in civil court. She could have had a hearing in the Senate before decision-makers would have been independent of the local church. This Court has repeatedly said churches can create tribunals for the governance of their officers. The church is key. Kennedy Again, that could be an argument you could make in the pretext here. Scalia Well, it's an argument we make in the hearing on whether the ministerial exception applies. Kennedy But you're asking for an exemption so these issues can't even be tried. Scalia Well, we're asking to apply the exemption. Kennedy It's almost like a summary judgment. Scalia It was precisely a motion for summary judgment. Kennedy That's the analogy, I think. Scalia It was a motion for summary judgment. Kennedy No, no, no. What she is saying is that you basically gave me summary judgment. You didn't allow me to go to the agency to have a proper test applied. The summary judgment was just an analogy. Forget it. Scalia I'm not entirely sure I understand the question. We agree she couldn't go to civil court if she's a minister. She could have gone to the Senate. She wasn't cut off from that. She decided not to do it. Kennedy But I am saying if there is some substantial interest that the church has, that can be litigated in the EEOC hearing. She was fired simply for asking for a hearing. I understand that. But once you start to litigate these cases. Sotomayor I think your point is that it's none of the business of the government to decide what the substantial interest of the church is. Kennedy That's one of my points, maybe the most important of my points. These decisions are committed to the churches by separation of church and State. But beyond that, once this process of trying to identify, we can decide some issues in this case and we won't get to other issues in this case, doesn't work. As Justice Breyer said in a First Circuit opinion, that requires more and more finely spun distinctions that create entanglement rather than avoid it. Universidad de Payamont. Roberts Counsel, you referred to the ministerial exception. But of course your position extends beyond ministers. How do we decide who's covered by the ministerial exception and who is not? Sotomayor Right. Here I think it's very easy. She's a commissioned minister in the church. She holds ecclesiastical office. She teaches the religion class. Roberts Counsel, well, let's say it's a teacher who teaches only purely secular subjects but leads the class in grace before lunch. Is that somebody who would be covered by the ministerial exception? The lower courts have said that person's not covered and we're not challenging that rule. We — obviously there has to be some kind of quantitative threshold. There will be line-drawing problems, but — Ginsburg But I thought your position would be if she's a commissioned minister, as distinguished from a teacher who conducts grace or takes the class to chapel, I'm taking — the chief is asking for somebody in this — you categorize as a minister, although mostly she's a math teacher. You would say the extent of her religious duties don't matter. What counts is that she is commissioned as a minister. If she's commissioned as a minister and if that is not a sham, then we think that makes her a minister. If you have a Jesuit teaching physics, we think he's still a priest and he's still controlled by the ministerial exception. Scalia Can we try whether it's a sham? I thought you said we couldn't try whether it's a sham. Is a sham different from a pretext? Scalia I certainly meant something different from a pretext. A sham is more extreme and it goes to a different point in the analysis. You can decide whether she's really a minister. That's the threshold question that courts must decide. And if we have a person with a ministerial title who is doing nothing at all religious or ministerial, we have a church that tries to say everyone, whoever worked for us, whoever may, is a minister, the courts can deal with those cases if they are. Scalia So you would allow the government courts to probe behind the church's assertion that this person is a minister? You would allow that, right? But once it is determined that the person is a minister, you would not allow the government to decide whether the firing was a pretext. That's right. Once we decide Roberts Different churches have different ideas about who's a minister. There are some churches who think all of our adherents are ministers of our faith. Now, does that mean that everybody who's a member of that church qualifies as a minister because that is part of the church's belief? Scalia I don't think it means that. And, again, I think courts have some capacity to look at what this employee is actually doing, and if he's not performing any of the functions of a religious leader, if he's not teaching the faith, then Roberts Every one of our adherents stands as a witness to our beliefs, and that, you know, not every church is hierarchical in terms of different offices. Scalia I understand that. And laypeople in many churches are expected to be witnesses, right? So Roberts I couldn't say people in many? Scalia Laypeople have to be witnesses. The fact that you are expected to witness to the faith when the occasion arises doesn't make you a minister. Kennedy But the answer you gave to the Chief Justice seems to me to be this case. I was interested. I didn't know about this minister capacity in this particular church. And as the Chief Justice indicates, many churches don't have, or some churches don't have what we think of as professional or full-time ministers at all. They're all ministers. And you said, well, that can be litigated. That can be investigated. And I suppose when we do that, we say, how many secular functions do you perform? And that's what this case is. But you don't even want that issue to be tried. You say that issue can't even be explored. Scalia Now, how many religious functions you perform can be explored? The issue that can be explored is whether she's a minister. We think she clearly is. The issue Scalia That term is a legal term. What constitutes a minister is decided by the law, not by the church, right? That is correct. That is correct. But I thought with a lot of deference to the church's understanding of whether someone is a minister. We think there should be deference to good faith understandings. But we are not arguing for rule that would enable an organization to fraudulently declare that everyone is a minister when it's not true. You decided the Tony Alamo case 20 years ago. We're not defending that. What makes it not true? What is the legal definition of minister? What is it? That you have to lead the congregation in their religious services or what? What is it? We think you, if you teach the doctrines of the faith, if that is part of your job responsibility is to teach the doctrines of the faith, we think you're a minister. Well, does that mean that any religious teacher is a minister under your theory? So, you know, there may be teachers in religious schools who teach religious subjects, not mathematics, but are not ordained or commissioned in any way as ministers. Are they ministers? If you're ordained or commissioned, that makes it very easy. If you teach the religion class, teach an entire class on religion, we think you ought to be within this. I thought that it was part of, it was agreed that there was no fact dispute that what she did, her duties at the school, did not change. She's, from when she's a contract teacher and therefore not a minister, and then she takes courses and is qualified to become a minister. But what she's doing at the school is the very same thing, and I thought that was the basis for the decision that we're reviewing, that there was no difference at all in what she did before she was commissioned and after she was commissioned. That's what the Sixth Circuit said. What they, you know, I don't think that changes the nature of the functions that were being performed. But what's relevant to that, that they neglected, was these non-commissioned these teachers who were not commissioned ministers, the lay and contract teachers, were fill-ins only when no-call teacher was available. And parish identifies only one person for one year. Ginsburg. Well, you're isolating one parish, but there was something in one of these briefs that said the majority of the teachers in the Lutheran schools. Let's see where it was. I think it was the Justice Ginsburg is looking, I had the same impression, that whether you're commissioned or not commissioned doesn't necessarily mean you can't teach a religious class. Well, it doesn't. And again, that's something that can be heard. You don't even want to hear it. It is not uncommon, even with ordained ministers, it's not uncommon among Protestants to recognize an ordination from a different denomination as similar teaching. So when they can't find a called minister to cover a class and to hire another Christian from another conservative Protestant denomination, they say, well, you teach here, you're required to teach Lutheran doctrine. I'm sorry. Going back to the question Justice Kagan asked you, if one of these Protestant teachers that's not Lutheran led the cafeteria prayer, as they're required to, you're now saying that the law must recognize that lay teacher as a minister and apply the ministerial exception, even though the religion doesn't consider her a minister? I didn't say that. Well, but that was the answer you gave. If she taught a religious class. She teaches a religion class, not if she really teaches a prayer. So what is your definition of minister? Maybe we need to find out. So it's not a title. It's really the only function you're saying anyone who teaches religion. I think if you teach the religion class, you're clearly a minister. But if you are — if you hold an ecclesiastical office, that makes this a very easy Okay. But this is — you're saying, A, forciori, but basically you'd be here anyway, even if she hadn't been ordained, right? That's correct. Okay. What is your — take a — what is your reaction to a less dramatic kind of holding? Suppose we were to say the truth is that the particular individual here does have some religious obligations in teaching and quite a lot that aren't. So she's sort of on the edge. At the same time, there is a statute which, whether it applies or not, you could take the principle, and it says a religious organization like your client may require that she conform to the religious tenets of the organization. So Congress focused on this. And the district court looks at it, suppose it were to decide, that's true, but there's no evidence here at all that religious tenets had anything to do with her being dismissed. No one mentioned them. She didn't know about them. I did until I read the very excellent brief filed by the Lutherans that explained the nature of taking civil suits. No one said that to her, whether it was in someone's mind or not. She found out on motion for summary judgment. So therefore, this wasn't an effort by the religious organization to express its tenets. She was dismissed. She could have — they could have had a defense, but it doesn't apply. And therefore, even though she's sort of like a minister, she loses. What are your objections to that? Well, my first objection is I don't think those are remotely the facts here. This teaching is clearly stated, embodying an elaborate dispute resolution process. You don't ask me to do that. Did anyone mention that to her? Indeed. Really? On my look, I couldn't find it. Can you tell me where someone did say the reason we're dismissing you is because of our religious doctrine that you cannot bring civil suits? Page 55 of the Joint Appendix, which is the letter where they tell her that they're going to recommend rescission of her call, they say because of insubordination and because you threatened to sue us. I mean, does anyone explain to her, which she might not have known, that this is a religious doctrine, that you are supposed to go to the synod or whatever and you're not supposed to go to court? Of course, they wanted to fire her because she threatened to sue them. But what I'm wondering is, is there anywhere before the motion for summary judgment where someone explains to her our motivation here is due to our religious tenet? You don't assess the importance of a doctrine by asking the person who invented it. No, no. I understand that, but I would like a different piece of matter, that the people who were involved in this were doing it for religious rather than civil reasons. I'm just wondering what the evidence is that they knew there was such a doctrine, that they were motivated by the religious doctrine, and that they expressed that to her. I just you know, I'll look at page 55. Is there anything else I should look at? The principle. Ginsburg. It's in the handbook. I mean, one of the objections, if this is a rule that's going to bind the teachers, then you would expect to find it in the handbook. But the handbook doesn't tell her if you complain to the EEOC about discrimination, then you will be fired. Well, I don't know if it does or it doesn't, because the handbook's not in the record except for a short excerpt. But she knew about this rule. Well, Mr. Lake, I'll ask for a citation in the record. I just wonder, is there anything you want me to read other than page 55? The principle in her deposition says, the minute she said she might sue, I said, you can't do that, you're a called teacher. The testimony is the board talked about it at their meeting on February 22nd. I think that's also in the principle's deposition. The president of the congregation, who did not deal directly with Parrish, said that it was one of the first things that he thought about. Parrish was a lifelong Lutheran. She worked 11 years in Lutheran school. She had these eight theology courses. It's simply not credible that she didn't know about this doctrine. Mr. Claycock, doesn't this inquiry, this illustrate the problems that will necessarily occur if you get into a pretext analysis? The question of, was she told that she had violated the church's teaching about suing in a civil tribunal? Well, that depends. The significance of — let's assume she wasn't told. The significance of that depends on how central a teaching of Lutheranism this is. It's like, suppose a Catholic priest got married and the bishop said, I'm removing you from your parish because of your conduct. Now, there wouldn't be much question about why that was done. So you would have to get in. What did Martin Luther actually say about suing the church or other Christians in a civil tribunal? Is this really a central tenet of Lutheranism? Isn't that the problem with going into this pretext analysis? That's just part of the problem. You've got to figure out how does this doctrine work, how important is it, how does it apply to the facts of this case, how does it interact with other doctrines. Mr. Claycock, you — in order, I think, to dispel the notion that nothing is permitted, in your reply brief you say that there are many suits that could be brought that would not be inappropriate. And I think it's on page 20 of your reply brief. But I don't understand how those would work if the policy is you're a minister, if you have quarrels with the church or co-worker, we have our own dispute resolution and you don't go outside. But you say, taught arising from unsafe working conditions. Suppose one of these commission workers said, I think that there are unsafe working conditions and I'm going to complain to the Occupational Health and Safety Agency. And wouldn't she get the same answer? This has to be solved in-house. You don't go to an agency of the State. Why — I don't follow why the tort claim based on unsafe working conditions would not fall under the same ban on keeping disputes in-house. It may or may not. The rule on internal dispute resolution is most emphatically and clearly stated as applying to disputes over fitness for ministry. And a tort claim may not be a dispute over fitness for ministry. But I thought the reason that she was unfit for the ministry was that she went outside the house. That's right. So in all of these cases, you go outside the church, you go to the government, then you have a — What we say in the passages and reply brief that you're looking at is the legal doctrine, the ministerial exception as a matter of law, does not apply unless the dispute is over, whether I get the job back, job qualifications, job performance, or rules of ministry. But the church's rules — But she could be, for any of these things, she could be disciplined, fired, because she complained outside the house. She could be. And her tort — if the tort claim would proceed, we think the retaliation claim should not proceed. The tort claim could proceed, and then she would get damages, and that would be all right. If she would get damages for the tort, she would not get damages for the loss of her position. Did you say — did I understand you before, in response to Justice Sotomayor and Justice Scalia, that even if she were merely a contract teacher, the fact that she teaches religion classes would be enough for her to qualify for the ministerial exception? Yes. And the fact that she's a commissioned minister is the clincher in this case. Is the clincher in this case, but even — I think you answered, if she were not a commissioned minister, she's teaching the faith, therefore, she can be fired, and it doesn't matter whether she's commissioned. So the commission is irrelevant. It's her job duties that count. Job duties are enough. Commission is not irrelevant. It is the clincher. Now, it was certainly, for some purposes, I mean, if every teacher who teaches religion and math and a lot of other things said, I'm a minister and I'm entitled to the parsonage allowance on my income tax return. Certainly, that's something that a government agent would review. Well, they do review it there. I think they're set. I don't think the Lutherans have any problems with the IRS on that, but, yes, that is a context where they review these questions. If I could reserve a few minutes for rebuttal, I would be grateful. You may. Ms. Kruger. Mr. Chief Justice, and may it please the Court. The freedom of religious communities to come together to express and share religious belief is a fundamental constitutional right, but it's a right that must also accommodate important governmental interests in securing the public welfare. Congress has not unconstitutionally infringed Petitioner's freedom in this case by making it illegal for it to fire a fourth-grade teacher in retaliation for asserting her statutory rights. Is the position of the United States that there is a ministerial exception or that there is not a ministerial exception? Mr. Chief Justice, if the ministerial exception is understood as a First Amendment doctrine that governs the adjudication of disputes between certain employees and their employers, we agree that that First Amendment doctrine exists. Nothing to do with respect to the ministers. In other words, is there a ministerial exception distinct from the right of association under the First Amendment? We think that the ministerial exception is one that incorporates the right of association as well as the rights under the religion clauses. Is there anything special about the fact that the people involved in this case are part of a religious organization? We think that the analysis is one that the Court has elaborated in other cases involving similar claims to autonomy, noninterference. Is that a no? You say it's similar to other cases. Expressive associations. A group of people who are interested in labor rights have expressive associations. Is the issue we're talking about here in the view of the United States any different than any other group of people who get together for an expressive right? We think the basic contours of the inquiry are not different. We think how the inquiry plays out in particular cases may be. It's extraordinary. It's extraordinary. We're talking here about the Free Exercise Clause and about the Establishment Clause, and you say they have no special application? But the inquiry that the Court has set out in its expressive associations, we think, translate quite well to analyzing the claim that Petitioner has made here. And for this reason, we don't think that the job duties of a particular religious employee in an organization are relevant to the inquiry. Nothing in the Constitution that explicitly prohibits the government from mucking around in a labor organization. Now, yes, you can, by an extension of First Amendment rights, derive such a rule. But there, black on white in the text of the Constitution are special protections for religion, and you say that makes no difference. Well, Justice Scalia, if I may, I don't understand Petitioner from the first half of this argument to have disputed this basic point, which is that the contours of the First Amendment doctrine at issue here will depend on a balancing of interests. That is the only way I think that Petitioner can differentiate a generally neutrally applicable application of anti-discrimination law with respect to a church's choice of those who would govern it and a church's retaliation against a teacher who would report child abuse to the authorities. Scalia, I think that the balancing of interests is different, according to the Petitioner, when one of the interests is religion, and you're just denying that. You say we balance religion the way we balance a labor organization. Well, Justice Scalia. That's certainly not what the Petitioner is saying. Here is where I think what the core of the insight of ministerial exception, as it was originally conceived, is, which is that there are certain relationships within a religious community that are so fundamental, so private and ecclesiastical in nature that it will take an extraordinarily compelling governmental interest to justify interference, concerns with health or safety, for example. But the government's general interest in eradicating discrimination in the workplace will not be sufficient to justify interference. Well, do you dispute the proposition that one of the central concerns of the Establishment Clause was preventing the government from choosing ministers? When there was an established church, the government chose the ministers or had a say in choosing the ministers. And the Establishment Clause, many argue, was centrally focused on eliminating that governmental power. Now, do you dispute that? No, Justice Alito, we don't dispute it. What we do dispute is that what is happening when the government applies generally applicable anti-retaliation law to a religious employer is that it is choosing a minister on behalf of the church. What it is instead doing is preventing religious employers, like any other employers, from punishing their employees for threatening to bring illegal conduct to the attention of the church. Well, you suppose that's the central tenet. Suppose you have a religion and the central tenet is you have a problem with what we do, go to the Sinai, don't go to court. And that applies to civil actions of all kinds. All right? So would that not be protected by the First Amendment? Justice Breyer, two points. Your view is it's not protected? It's not protected, but I'd like to, I think there are two responses that are relevant to how this Court would resolve that question in this case. First of all, if the Court were to accept the rule that Petitioner would ask it to adopt, we would never ask the question whether or not the church has a reason for firing an employee that's rooted in religious doctrine. Their submission is that the hiring and firing decisions with respect to parochial school teachers and with respect to priests is categorically off-limits. And we think that that is a rule that is insufficiently attentive to the relative public and private interests at stake. Interests that this Court has repeatedly recognized are important in determining the association of priests. So in fact, if they want to choose the priest, you could go to the Catholic church and say they have to be women. I mean, you couldn't say that. That's obvious. So how are you distinguishing this? Right. We think that both the private and public interests are very different in the two scenarios. The government's general interest in eradicating discrimination in the workplace is simply not sufficient to justify changing the way that the Catholic church chooses its priests based on gender roles that are rooted in religious doctrine. But the interests in this case are quite different. The government has a compelling and indeed overriding interest in ensuring that a legal context And when you say that, are you not implicitly making a judgment about the relative importance of the Catholic doctrine that only males can be ordained as priests and the Lutheran doctrine that a Lutheran should not sue the church in civil courts? I don't see any distinction between — I can't reconcile your position on those two issues without coming to the conclusion that you think the Catholic doctrine is older, stronger, and entitled to more respect than the Lutheran doctrine. No. We're not — we're not drawing distinctions between the importance of a particular religious tenet in a system of religious belief. But the difference is that the government has an indeed foundational interest in ensuring as a matter of preserving the integrity of the rule of law that individuals are not punished for — You're saying that going to church — Sorry. That going to court is a more fundamental interest than a woman obtaining the job that she wants, which happens in this case to be a Catholic priest. That's the distinction you're making? I am drawing a distinction. Oh, well, why? I don't know why that doesn't — I mean, you may be right, but it isn't obvious to me that the one is the more important than the other. The government's interest in preventing retaliation against those who would go to civil authorities with civil wrongs is foundational to the rule of law. Ms. Kruger, if I could just clarify for a second there, because you're now sounding as though you want to draw a sharp line between retaliation claims and substantive discrimination claims. And I didn't get that from your brief. So is that, in fact, what you're saying? I think that there is an important distinction to be made between the government's general interest in eradicating discrimination from the workplace and the government's interest in ensuring that individuals are not chilled from coming to civil authorities with reports about civil wrongs. But if I could continue, I think that the — So are you willing to accept the ministerial exception for substantive discrimination claims, just not for retaliation claims? I don't think that those are the only two sets of inquiries that are important in the balancing. And if I could continue, I think the government's — I'm sorry. That wasn't yes. I think that question can be answered yes or no. I think that that doesn't — I think the answer is no in part because that doesn't fully account for all of the public and private interests at stake. The government's interest extends in this case beyond the fact that this is a retaliation to the fact that this is not a church operating internally to promulgate and express religious belief internally. It is a church that has decided to open its doors to the public to provide the service, socially beneficial service, of educating children for a fee in compliance with state compulsory education laws. And this Court has recognized in cases like Bob Jones that church-operated schools sit in a different position with respect to the permissible scope of governmental regulation. Even with respect to their religion classes and their theology classes? It's extraordinary. Well, the government's — Just because — just because you have to comply with state education requirements on secular subjects, your — who you pick to teach theology or to teach religion has to be — has to be subject to state control? Justice Scalia, to be clear, the government's interest in this case is not in dictating to the church-operated school who it may choose to teach religion classes and who it may not. It is one thing and one thing only, which is to tell the school that it may not punish its employees for threatening to report civil wrongs to civil authorities. That is an interest that we think overrides the burden on the association's religious message about the virtues of internal dispute resolution as opposed to court resolution. You're making — you're making a judgment about how important a particular religious belief is to a church. You're saying — this may just be the same question Justice Alito asked, but you're saying we don't believe the Lutheran Church when it says that this is an important and central tenet of our faith. No, absolutely not, Mr. Chief Justice. We do not dispute. When they assert that it's an important tenet, we assume its validity. We assume that they are sincere in that religious belief. But just as in United States v. Lee, the sincere religious belief was not sufficient to warrant an exemption from generally applicable tax laws, as in Bob Jones. On the other hand, the belief of the Catholic Church that priests should be male only, you do defer to that. Even if the Lutherans say, look, our dispute resolution belief is just as important to a Lutheran as the all-male clergy is to a Catholic. Yes, but that's because the balance of relative public and private interests is different in each case. Do you believe, Ms. Kruger, that a church has a right that's grounded in the free exercise clause and or the establishment clause to institutional autonomy with respect to its employees? We don't see that line of church autonomy principles in the religion clause jurisprudence as such. We see it as a question of freedom of association. We think that this case is perhaps one of the cases— So this is to go back to Justice Scalia's question, because I, too, find that amazing that you think that the free — neither the free exercise clause nor the establishment clause has anything to say about a church's relationship with its own employees. We think that this is one of the cases that Employment Division v. Smith may have been referring to when it referred to free association claims that are reinforced by free exercise concerns. It's certainly true that the association's claim to autonomy in this case is one that is deeply rooted in concerns about how it exercises its religion. Those two things merge in some ways in that respect. I don't think they merge at all. Smith didn't involve employment by a church. It had nothing to do with who the church could employ. I don't see how that has any relevance to this. I didn't understand your answer to the Chief Justice's question. You say that there were different institutional values or government values involved with respect to a Catholic priest than there is with respect to this Lutheran minister. Let's assume that a Catholic priest is removed from his duties because he married. Okay? And he claims, no, that's not the real reason. The real reason is because I threatened to sue the church. Okay? So that reason is just pretextual. Would you allow the government to go into the dismissal of the Catholic priest to see whether, indeed, it was pretextual? I think the answer is no, Justice Scalia. Why? Why is that any different from the Lutheran minister? I would begin with looking at the burdens on association under the balancing test. I think that the core of the understanding of the ministerial exception, as it was elaborated in the lower courts, is that there is a fundamental difference between governmental regulation that operates to interfere with the relationship between a church and those who would govern it, those who would preach the word to the congregations, those who would administer its sacraments, on the one hand, and the more public relationship between a church and a schoolteacher and others that provide services to the public and church. I think that's saying nothing different than what the Chief Justice suggests, that you think the one is more important to Catholics than the other is to Lutherans. I don't think it's a question of the importance of either function to the religious association. It's a question of the realm of permissible. Breyer. Some then you have to say that it's more important to let people go to court to sue about sex discrimination than it is for a woman to get a job. I can't say that one way or the other. So I'm stuck. And since I'm really sort of this is tough and I'm stuck on this, I don't see how you can avoid going into religion to some degree. You have to decide if this is really a minister, for example, and what kind of minister. That gets you right involved. Or if you're not going to do that, you're going to go and look to see what are their religious tenets, and that gets you right involved. I just can't see a way of getting out of something, getting out of the whole thing. I don't see how to do it. So suppose you said in case of doubt like that, we'll try what Congress suggested. And now we have here a borderline case of ministry, not the Heartland case. So you say, all right, well, you have a borderline case. The constitutional issue goes away, and what Congress said is okay. So now what you have to prove is you have to prove that the Church has to show that the applicant was disciplined or whatever because she didn't conform to the religious tenets. All right? That's what they have to show. And I'm sorry, they maybe only make a prima facie case, but they've got to show it. And if they don't show that there was at least some evidence to that effect and that somebody knew about the religious tenet and there was something like that, maybe it's in the air, as is obvious with Justice Alito's question, but where it isn't in the air, you'd have to make a showing. Now, I see that's an interference, but I don't see how you avoid an interference someplace or the other. Otherwise, you're going to get into who's a minister. So what's the answer to this dilemma? At the moment, I'm making an argument for following what Congress said. Go back and try it that way, and if they can show in this case and she shows in this case nobody ever thought of the religious tenet, nobody told me, and they didn't read it, then she's going to win. And if they come in and show that they really did this because of their religious tenet, they'll win. What about that? Justice Breyer, I think that that is a perfectly appropriate way to come at this case, although it skips over sort of the initial inquiry, which is into whether or not the application of the regulation to the particular employment relationship results in an unwarranted interference. Well, it does have the virtue of deciding a statutory question before a tough constitutional question. And I agree with what we sometimes do. That seems bizarre. But I thought that was the basic rule. I think that that's absolutely right, Justice Breyer. And I think the next question becomes, with respect to adjudicating a particular case, whether deciding the case would require the Court to decide disputed matters of religious doctrine or to second-guess, essentially subjective. Well, if the plaintiff proceeded that way, would she be entitled to, I assume she would, introduce testimony by experts on Lutheranism, theologians, professors of religion about how the — about this tenet, and it isn't really, they might say, well, it's really not that strong and it once was, but it's faded and it's not widely enforced, and then you'd have experts on the other side, and you'd have a court and a lay jury deciding how important this really is to Lutherans. Is that how that would play out? No, it's not how it would play out. How are you going to avoid that? I just don't see it. Any inquiry into the validity of a particular religious doctrine is simply irrelevant to the adjudication of a dispute, which is designed to find out just one thing, which is whether it was proffered by the employer. No, it's not irrelevant. I've seen dozens and dozens and dozens of pretext cases, and in practically every pretext case that I've seen, one of the central issues is whether the reason that was proffered by the employer is the real reason, is an important reason for that, for that employer, and whether they really think it's important and whether they apply it across the board. That's almost always a big part of the case. And once you get into that, you're going to get into questions of religious doctrine. I just don't see it. Let me give you an example of a real case. A nun wanted to be — wanted a tenured position teaching canon law at Catholic University, and she claimed that she was denied tenure because of her — because of her gender. Now, there, the university might argue, no, she was — and did argue, she was denied tenure because of the quality of her — of her scholarship. And, okay, now, if you try that pretext issue, the issue is going to be, what is the real quality of her canon law scholarship? And you're going to have the judge and the jury decide whether the particular writings on canon law are — make a contribution to canon law scholarship. How can something like that be tried without getting into religious issues? If the only way that the plaintiff has to show that that may not have been the employer's real reason was a subjective judgment about the quality of canon law scholarship, then judgment has to be entered for the employer, because the plaintiff has no viable way, consistent with the Establishment Clause, of demonstrating that wasn't the employer's real reason. If, on the other hand, the plaintiff has evidence that no one ever raised any objections to the quality of her scholarship, but they raised objections to women serving in certain roles in the school, and those roles were not ones that were required to be filled by persons of a particular gender, consistent with religious beliefs, then that's a case in which a judge can instruct a jury that its job is not to inquire into the validity of the subjective judgment, just as juries are often instructed that their job is not to determine whether an employer's business judgment was fair or correct, but only whether the employer was motivated by discrimination or retaliation. Thank you, Ms. Kruger. Mr. Chief Justice, it may have been. Mr. Dellinger, could you assume from me that, I'm sorry. Could you assume from me that, is it? Justice Kagan. I feel like I missed something. Mr. Dellinger, could you assume from me that there is a ministerial exception that's founded in the religion clauses, and tell me who counts as a minister and why this commissioned minister does not count as a minister? I believe that there is an exemption grounded in the religion clauses. It means that religious organizations will win, will prevail in many cases, in which a comparable civil organization would not prevail. I don't think that it makes sense to approach it in a categorical way of asking to. I'm just asking you to assume with me for a moment that there is a categorical exception and to tell me who you think counts as a minister and why the woman in this case does not. Well, in our view, if that was the test, then we would say that the court of appeals was correct in holding that she was not a minister. And the reason, the principal reason is she carries out such important secular functions in addition to her religious duties. That can't, I'm sorry to interrupt you, but that can't be the test. The Pope is a head of State carrying out secular functions, right? Those are important. So he's not a minister? Chief Justice Roberts, I do not want to suggest that it's a very good approach to try to decide who's a minister and who's not a minister. That's what's wrong with Professor Laycock's categorical approach, because it's both over- and under-inclusive. It sweeps in cases where there is, in fact, no religious reason offered for the dismissal. Scalia, it's only a bad approach if we adopt your test. Why isn't a perfectly reasonable test whether the person, although the person may have a lot of secular duties, whether the person has substantial religious responsibilities? And the reason that is not a satisfactory test is that it fails to take account of the important governmental interest. For example, in this case, in having everyone have access to the courts, to the courts. But that isn't the problem. The problem, it seems to me, is I don't know how substantial these interests are religiously. I don't know how substantial the religion itself considers what they do from a religious perspective. So let's go back to Justice Alito's problem. And now on the ministerial issue, we call the Sinaids, we call the how certain was it, how central is it to the heart of the religion, what they're actually doing, and we replicate exactly what he said in respect to the problem of religious tenant, now in respect to the problem of religious minister. And maybe you can tell me we don't have to go into the one or the other, but I've had enough of these cases in the lower court to know they are really hard, people believe really different things, and I see no way to avoid going into one or the other. And therefore, I think rather than try this constitutional matter, let's go to the one Congress suggests. Now, what do you do? That's the state of the argument that you're walking into, I think. If we go to Congress, Congress made it quite clear how this case should be resolved, because Congress expressly did not apply the religious exemptions of the ADA to retaliation. Breyer. I don't agree with that. I think what it says is a religious organization may require that all applicants and employees conform to the religious tenants. It put that in the section defining defenses. The defenses are part of the right, and when it forbids retaliation, it says retaliation against an individual for the exercise of any right granted. And therefore, I don't believe that a person who has failed to violate the substantive section could be held up normally. I mean, I don't understand. I don't understand retaliation. So I can think it's pretty easy to read that exception, even though it's in a different subchapter, into the retaliations exception. Assume for me that that's so. It is still the case that as a constitutional matter, the State's interest in allowing citizens to have access to its courts and to its agencies is paramount in cases like child abuse, reporting of school safety problems, and others. In this case, it's we are mindful. Scalia. But it's not paramount. Would you take the firing of a Catholic priest example? Does that get into the courts? No, it doesn't. And the reason is that there is, and that points out, Justice Scalia, that there are ample doctrines to protect church autonomy. One is that under the Establishment Clause, there can be no reinstatement ordered by a court of someone to an ecclesiastical position. Another, mentioned by General Kruger, is that he can sue for money, right? I do not believe that he can be reinstated to get damages for removal from the priest. He can sue for money. He can sue for the, you know, the loss of ownership. I think in that case, that is very likely to fail because you are going to run into a issues of religious doctrine or evaluations of distinctly religious matters like EEOC versus Catholic University. Those doctrines still stand. The problem with the this categorical exception is it sweeps in cases like this one, where the well-pleaded complaint in this case simply says, I was dismissed from my Santa was going to make a report to the EEOC, and she's not seeking reinstatement. She just wants the economic loss. There's no need to go to the other side of the line. Alito, I think I would just come back to the example of the canon law professor, because I still don't see how the approach that the Solicitor General is recognizing is recommending could eliminate the problems involved in pretext. So the as I understood her answer, it was that you couldn't look into the pretext of the question of whether the professor's canon law scholarship was really good canon law scholarship, but you could try the issue of sex discrimination based on other evidence. So maybe there's some stray remarks here and there about a woman teaching canon law. Now, a response to that might be, that wasn't the real reason. And if you just look at this scholarship and you see how miserable it is and how inconsistent it is with church doctrine, you can see that that's the real reason. So you just cannot get away from evaluating religious issues. This is not a problem that is unique to ministerial employees, which is why this is both over and under-inclusive. When you — this is a circumstance in which an organization has gone into the public arena providing a public service, and in that situation, it ought to be governed by the same rules. Justice Scalia, you said this case is not like Employment Division v. Smith. But under Employment Division v. Smith, we know that the State could forbid a school from — a religious school from using peyote in its ceremonies. But under Petitioner's submission, they could fire any employee who reported that use of peyote to civil authorities, and that employee would have no recourse. We know that under U.S. v. Lee, an Amish employer has to comply with the Social Security laws, but under their submission, the employer could fire without recourse any employee who called noncompliance to the attention of the EEOC. We believe that you can trust Congress on these hard areas where there needs to be additional accommodations. Congress could make them, just as Justice Scalia suggested. The ministerial exemption has a long history, Justice Alito, but in almost every circuit, it did not apply to teachers. So we have to think about it. Alito, did it not antedate the enactment of the Americans with Disabilities Act? That is correct. When that was in effect. So shouldn't we assume that Congress — that Congress assumed that it would continue to apply to the ADA, just as it applied to Title VII? It — the lower courts had not applied as sweepingly as to teachers. And I think we had this debate with Justice Breyer about whether you can say that in retaliation cases, but remember that that doctrine emerged at a time when this Court had a position that religious organizations could not participate in getting public funding, even when they were providing remedial services to low-income students. We repudiated that doctrine in Agostini v. Felton, and where the Court said that you are entitled to participate in providing public services on the same basis as all other religious organizations, that means that you should comply, in some instances, with the same rules. When you leave the cloister and go into the public arena and provide public services. Scalia's do Lutheran schools and Catholic parochial schools share public funds the same way public schools do? No. They don't, Justice. I bet you they don't. But they are entitled to. What is this argument you're making? I don't understand. Because we are no longer — we are no longer of the Aguilar v. Felton era, the principle of re-employment in Abish v. Smith, where we believe that no governmental rules for involvement can be had with these public institutions. Don't tell me that fair is fair, that now, you know, we're just like everybody else. That's not true. It's that we have recognized, in your opinion in Smith and in Justice Kennedy's opinion in Rosenberger, the value of neutrality, where you have doctrines. We recognize you do not second-guess religious doctrine. You do not, under the Establishment Clause, introduce someone into an ecclesiastical office, and you do a balancing test to make sure that there's a sufficient governmental interest if you're going to undercut an organization's ability to convey its views. Thank you. Thank you, Mr. Dellinger. Mr. Laycock, two minutes. Two or three points very briefly. The many distinctions and balancing tests in their argument show the mess you will be in if you try to decide these cases. And we may have a line-drawing problem at the margin, but many, many cases are easy. The priest, the rabbi, the bishop, the pastor of the congregation cannot sue. Under their rule, they can sue. Mr. Laycock. I'm not sure why the status of the individual matters under your theory. It seems to me what you're saying is so long as a religious organization gives a religious reason of any kind, genuine or not, for firing someone that's Am I hearing your argument right? No. So why is there a difference? The position of minister is categorically special because that is committed to the church in a system of separation of church and state. You may have religious questions when they dismiss the janitor, but the level of sensitivity is not remotely the same. And so you would say with janitors you can get into the pretext question? The janitor can litigate his pretext question, yes. So you're limiting your test to whether that person is a minister. So define minister for me again. A minister is a person who holds ecclesiastical office in the church or who exercises important religious functions, most obviously including teaching of the faith. Mr. Laycock, Mr. Dellinger has some points here about the way in which the ministerial exception relates or doesn't relate to Employment Division v. Smith. And it seems to me that in order to make an argument for the ministerial exception, you in some sense have to say that institutional autonomy is different from individual conscience, that we've said in Smith that State interests can trump individual conscience, and you want us to say that they can't trump institutional autonomy. So why is that? It's not that institutions are different from individuals. It is that the institutional governance of the church is at a prior step. Smith is about whether people can act on their religious teachings after they're formulated. The selection of ministers is about the process by which those religious teachings will be formulated. Smith distinguishes those cases. Sotomayor, might not the Establishment Clause have something to do with the question which applies to institutions? That's the second answer. Or the Free Exercise Clause applies to individuals. This Court has relied on both Free Exercise and Establishment, Serbian, Kedroff, Kresher, Gonzales, there's a long line of cases all the way back to Watson, distinguishing this problem from the problem that culminates in Smith. Thank you, counsel. Counsel. The case is submitted.